**LAMBERT CORPORATION,**
**Plaintiff-Appellee,**

v.

**Robert B. EVANS and Walter E. Haines,**
**d/b/a M–B Company, a partnership,**
**Defendants-Appellants.**

**No. 76–2287.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1977.
Decided April 20, 1978.

Thomas L. Smallwood, Milwaukee, Wis., for defendants-appellants.

John R. Dawson, Milwaukee, Wis., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, COWEN, Senior Judge,* and PELL, Circuit Judge.

PELL, Circuit Judge.

After a bench trial in this diversity action, plaintiff-appellee Lambert Corporation was awarded judgment against defendants-appellants Evans and Haines, jointly and severally, in the amount of $43,012.41 plus costs and disbursements. The district court's judgment was based on a contract which it found had been entered by Lambert Corporation and the M–B Company, a business which appellants owned as partners. Lester Blumberg, whose title in the partnership was Vice President and General Manager, was the principal actor in the pertinent events for M–B. William Lambert acted for Lambert Corporation. Each had appropriate authority.

The contract in question involved the sale of Lambert Corporation's product line of industrial floor sweepers to M–B Company. Appellants defend on the basis that no enforceable agreement was ever made. The facts, which are not substantially disputed, and which, as found by the district court, we do not view as clearly erroneous, are as follows:

Lambert Corporation manufactured and distributed lawn sweepers, powered lawn vacuums, and garden tools for consumer use. The line of walk-behind floor sweepers involved in this case had been developed by Lambert as an outgrowth of its experience with its regular line of consumer products, and incorporated a patented dust control system. The line was designed for industrial use, and was sold through different channels to different customers than the rest of Lambert's products, which apparently resulted in marketing problems. Lambert never enjoyed any real success in marketing the line. In fact, by 1969, total sales of the products in the line had declined to the level of several hundred dollars. Accordingly, Lambert Corporation be-

* The Honorable Wilson Cowen, Senior Judge of the United States Court of Claims, is sitting by designation.

gan in the late 1960's to attempt to sell the product line. Despite substantial efforts, nothing had come of these efforts as of May 1970.

At the suggestion of a business broker, William Lambert telephoned Evans in May 1970. Evans expressed interest in pursuing the matter further, and Lambert wrote him on May 25, 1970, offering for sale the product line "package," consisting of

[a]ll drawings; bills of material; supplier listings; U.S. and foreign patents; all tools, dies, jigs, and fixtures; and inventory (approximately $24,000 in cost) for a total of $85,000.

Haines, by letter of June 9, responded to Lambert, continuing to express definite interest, and requesting some additional information, at least part of which was provided in Lambert's letter to Haines of August 4.

On October 30, 1970, Blumberg visited the Lambert Corporation's offices and plant in Ohio, spending the entire business day there with William Lambert. There is no doubt that the purpose of the visit was to learn more about the proffered product line, that the two men spent the day pursuing that goal, and that no agreement was reached. Beyond this, the details of what was seen and discussed are not entirely clear, for Lambert and Blumberg gave differing testimony on the point. Because one of the arguments the appellants make here is that they never had learned enough about exactly what it was that Lambert Corporation was selling to have reached the point of agreeing to buy it, we take special note of the district court's finding that Blumberg's subsequent written report of his visit to Haines (dated November 11, 1970) indicated substantial knowledge on this score. Blumberg's letter to Haines also expressed the view that the Lambert products would fit "very nicely" into M–B's floor sweeper line, but judged their value to M–B to be no more than $20,000 plus inventory.

On December 7, 1970, William Lambert wrote a short letter to Blumberg inquiring about the status of M–B's evaluation of the proposal and offering to provide additional information. On December 17, Blumberg wrote a significant letter to Lambert:

Almost two months have gone by since we stopped to see you. We still remember the pleasant visit.

After some time, the discussions with our principals, Mr. Evans and Mr. Haines, were finally concluded and it leaves the final decision still somewhat up in the air because we are making a counter-proposal which you may or may not be interested in.

We do not feel that the package of the Sweeper and Engineering would be worth anymore than $20,000 to us and we would acquire the inventory on a pay as used basis. This has been worked out in the past several experiences we have had on this set-up whereby the inventory was consigned to us. We paid it as we invoiced the machines either once a month or quarterly as desired by the seller. The inventory then, was expected to be paid out in two years. Any remaining inventory was left up to the decision of the former owner as to its disposition at that time.

We realize this proposal is quite away from your suggested amount but if you are at all interested, we would be pleased to hear from you.

After checking unsuccessfully with another company to which he had proposed sale of the line, Lambert telephoned Blumberg on December 29. The district court found that in this crucial telephone call the parties reached an agreement.

Once again, Blumberg's and Lambert's accounts of what transpired do not entirely coincide. Lambert testified that he told Blumberg he was calling to accept M–B's proposal, at the price of $20,000 plus the cost of the inventory. Although agreeing to the "pay as used procedure," Lambert requested M–B to take title to the inventory immediately to avoid for Lambert Corporation legal consequences of doing business in Wisconsin, and Blumberg agreed to this. Lambert stated that he and Blumberg agreed that a formal document would be

drawn up by M–B's attorneys and submitted to Lambert Corporation, but he also testified that he had no doubt that he and Blumberg had made an agreement, by which he felt bound at that time. In fact, he and Blumberg spent some time during the call congratulating each other on having reached agreement.

Blumberg's testimony was much less clear. He frequently stated that he could not recall the details of the conversation. Responses to some questions were equivocal. The tenor of his testimony was that Lambert may well have said that the M–B counterproposal was acceptable, and he and Lambert may have congratulated each other, but his remembrance of the telephone call was that nothing binding had been accomplished, nor would it be, until a formal contract was signed by the parties. The district court expressly found Lambert's version of this telephone conversation to be "considerably" more credible than Blumberg's.

■ Appellants make three arguments on appeal. The first, that the contract, if any was made, does not satisfy the statute of frauds, does not merit extended discussion. There can be no real doubt that both of the parties were "merchants," as that term is defined in the Uniform Commercial Code, § 2–104(1) (and see Comment 2 thereto), Wis.Stats.1975 § 402.104(1). That being so, the Code's general statute of frauds, § 2–201(1), Wis.Stats.1975 § 402.201(1), need not be satisfied if the conditions of § 2–201(2), Wis.Stats.1975 § 402.201(2), are met:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of sub. (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

In this case, William Lambert dispatched to Blumberg a letter on the very day they spoke on the telephone, confirming his ac-

ceptance of the December 17 letter proposal, noting the special provisions he and Blumberg had agreed to with reference to the inventory. Notwithstanding receipt of this letter, no one at M–B ever objected to its contents. We think the district court's conclusion that the statute of frauds was thus satisfied is eminently correct.

■ The second argument is that no enforceable agreement was reached, because both parties understood that a formal document would be drawn up to embody the agreement. As a matter of law, this theory is tenable enough. Even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. On the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.

The parties herein agree that this is the law, as did the district court. *See Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 58 Wis.2d 405, 206 N.W.2d 408, 412 (1973); *Joseph v. Doraty*, 144 N.E.2d 111, 113 (Ohio App.1957);[1] *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); 1 Restatement of Contracts § 26 (1932); 1 S. Williston, Contracts § 28 at 69 (3d ed. 1957); 1 Corbin on Contracts § 30, at 104–12 (1963).

We reject the defendants' argument, then, not because it is wrong on the law but because it is wrong on the facts. The district court to which the case was fully tried found that

> although both Mr. Lambert and Mr. Blumberg expected that their respective attorneys would prepare and review a formalized document reducing their agreement to writing, neither individual understood, as of the date of their telephone conversation on December 29, that

---

1. The absence of any meaningful difference between the law on this point in Wisconsin and

Ohio obviates the necessity to choose one of these states as the proper source of law.

they had not entered into a binding agreement.

■ We are not unmindful of the fact that Lambert's confirming letter refers to his acceptance as being "subject to completion of such documents, papers, and formal written agreement satisfactory to our counsel." If we were trying this case de novo, we might put this statement on appellants' side of the ledger, for it does, standing alone, tend to support their position. In the context of all the circumstances we have described, however, we cannot reverse as erroneous the district court's implicit finding that the statement was nothing more than an inartful phrasing of the parties' understanding that their agreement would be formalized by M–B's counsel and submitted to Lambert's.

Rule 52(a), Fed.R.Civ.P., cautions us that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." That rule has particular force in this case, where the district court made an express credibility determination, and where the pertinent law makes the intent of the parties on December 29, 1970, the critical issue:

> Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them.

*United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

We decline to overturn the district court's finding. In light of the importance of witness credibility thereto, the testimony of Lambert that he called and accepted the terms of M–B's proposal and that he and Blumberg congratulated each other on reaching agreement would probably be more than enough evidence to support the finding. But there is more. Blumberg never squarely denied the essence of Lambert's account, nor did anyone at M–B ever indicate to Lambert that his assumption, clearly revealed in his December 29 letter, that a contract had been made, was, in their

view, premature. Also, Blumberg's own contemporaneous notes of the telephone call read as follows:

> Dec. 29th phone call from Lambert he considers it "wise & proper to take us up on the $20,000 proposal. [No closing quotation marks appear in the note.]

Lambert's contemporaneous notes reflect the same understanding. Finally, although several letters and telephone calls between the parties intervened, it was not until a letter of August 3, 1971, that M–B expressed its view that no contract had been made, and even then, that view, at best, was expressed only obliquely.

■ Appellants suggest a number of points that, they say, cut against any finding of intent to be bound on December 29. They insist they did not really know all that much about the product line they were considering buying, that more extensive review of the acquisition by engineers, accountants, and lawyers would inevitably be undertaken by M–B (and, indeed, by any prudent businessman) before finalizing anything, and that this custom was communicated to Lambert during the October 30 visit. We quickly reject the invitation to take judicial notice of the "fact" that any sensible businessman would engage in extensive and costly additional review in making such a relatively minor and inexpensive acquisition. The district court found, and Blumberg admitted, in fact, that such was not even M–B's custom for small acquisitions. Insofar as the argument is that Lambert was somehow put on notice that he could not presume M–B would be ready to contract before more extensive review, Blumberg's December 17 letter and the December 29 telephone conversation gave Lambert more recent reason to believe just the opposite. Moreover, Haines' first letter to Lambert suggested this also, by referring to Haines' hope to make a single trip with Blumberg to Ohio "to review and hopefully resolve the situation." The notion that appellants lacked sufficient information to contract is further undercut by the district court's finding, fully supported by the evidence, that Lambert and Blumberg on Oc-

tober 30 viewed or discussed all of the component parts of the sale package, and the concrete knowledge about the proposal Blumberg showed in his report on the visit to Haines.

Next appellants point to the fact that there were numerous matters about the transaction on which the parties never agreed. This provides no support to appellants' argument against the court's finding of intent to contract, for there is nothing in the law of contracts that requires parties' minds to meet on all conceivably related questions. See *Peninsular Carpets, supra; Allen v. Wolf River Lumber Co.*, 169 Wis. 253, 172 N.W. 158 (1919); *V'Soske v. Barwick, supra* at 500; *Owens v. Clow Corporation*, 491 F.2d 101 (5th Cir. 1974). The district court's finding that the parties agreed to contract knowing "what was for sale, the selling price, and the basics of what the price included" is sufficient, at least where, as here, appellants have failed to demonstrate in their speculative listing any terms of any real consequence on which agreement was not reached.

As we have said, we affirm the district court's determination that an enforceable contract was made and that appellants are liable for its breach. We also affirm the uncontested finding that Lambert Corporation made reasonable efforts, after M–B's refusal to perform became clear, to sell the sweeper line to others, but was unable to do so at a reasonable price. Thus the district court was correct in concluding that Lambert Corporation was entitled to recover the contract price under U.C.C. § 2–709(1)(b), Wis.Stats.1975 § 402.709(1)(b).

We cannot, however, affirm the judgment in the amount of $43,012.41, for we are persuaded by appellants' final argument that there was no agreement that their company would definitely, under all circumstances, use and pay for the entire stock of inventory parts. It will be recalled that the parties agreed to Blumberg's "pay as used" proposal for the inventory. As set out in Blumberg's December 17 letter, quoted *supra*, that proposal involved an expectation that M–B ought to be able to use the inventory up, and to pay for it, within two years, but it was expressly contemplated that such might not occur. It was this procedure to which Lambert agreed on December 29, with the sole change that M–B would take title immediately, which we do not regard as increasing M–B's obligation to use and pay for all the inventory. In fact, Lambert, while echoing the expectation that it would not take long for M–B to use up the inventory once it started production of the sweeper line, admitted at trial that there was no agreement that all the inventory would be used.

It was error, then, to award appellee judgment at this time in the full amount of its cost for the inventory, $23,934.41.[2] The judgment must be vacated and the case remanded, so that the district court may give the appropriate attention to this problem. Beyond that, we can only offer guidance. We cannot know whether appellants, now that it is clear an enforceable contract for the sweeper line was made, and that they will have to pay the $20,000.00 contract price, will choose to have the inventory shipped to them and proceed to put the line into production. If they do so, they will presumably use the inventory and pay for it as used, and damage relief now would be distinctly premature. They may, on the other hand, refuse to accept shipment and stand on their asserted right to use none of the inventory. This possibility appears the more likely in light of the allegations of the answer, which the district court did not find it necessary to make findings on, that the partnership which at all times pertinent here owned M–B has been dissolved.[3]

2. The final judgment figure arrived at by the district court employed this figure, which was the cost value put on inventory by Lambert during his testimony. We assume, accordingly, that the district court's second conclusion of law, which the value was stated to be $23,929, involved a mere typographical error.

3. It is, of course, also possible that one of the appellants continues to have an interest in M–B, and that he or the new owner(s) will wish to make use of the Lambert Corporation

■ If the latter situation should develop, additional findings and conclusions will be necessary. To say that there was no definite contract that M–B would use all the inventory does not mean M–B was free, on any whim, to use none of it. We think the parties' mutual expectations that M–B would produce the sweeper line and use Lambert's old inventory in so doing have significance here. Although the parties have cited and we have discovered no case on point, we think the situation is usefully analogous to a requirements contract. In such contracts, the U.C.C. provides, § 2–306(1), Wis.Stats.1975 § 402.306(1), that

[a] term which measures the quantity by the . . . requirements of the buyer means such actual . . . requirements as may occur in good faith . . . .

■ The good faith requirements rule by which appellants' liability to pay for inventory parts must be assessed was found in the common law; the Code merely codifies it. 1 A. Squillante & J. Fonseca, Williston on Sales § 10–4(5) at 390 (4th ed. 1973); *HML Corporation v. General Foods Corporation*, 365 F.2d 77, 81 (3d Cir. 1966). Absent a contrary agreement, it is generally held that a requirements buyer does not undertake to manage his business in such a

way as to establish or maintain any particular level of requirements. His contract is, quite simply, to buy what he needs from the requirements seller.

[G]enerally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business.

*Id.; Accord, Western Oil & Fuel Company v. Kemp*, 245 F.2d 633, 638 (8th Cir. 1957); *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.*, 102 F.2d 630, 632–33 (10th Cir. 1939). *See also* 1 Williston on Sales, *supra*, § 10–4(1) at 386; 1A Corbin on Contracts § 156 at 33 (1963).[4]

Both before and throughout this litigation, appellants have maintained that financial and production difficulties made it impossible for them to add the Lambert Corporation sweepers to M–B's product line. On remand, the district court must determine if such a business judgment, and not just a desire to avoid contractual obligations to Lambert, was in fact the basis for M–B's decision not to put a walk-behind sweeper line into production.[5] If so, then a

---

sweeper line, in which case appropriate arrangements will presumably be made which could avoid the necessity of the district court's deciding the question of how much, if any, of the inventory must be paid for as part of the judgment.

4. We have found no reason to assume that the Supreme Courts of Ohio or Wisconsin would choose to follow a different approach.

5. In this regard, we note finding 29 made by the district court, in which the court expressed the view that profitability problems with the sweeper line M–B was already producing became apparent at about the same time M–B first balked at adding the Lambert Corporation sweepers, and underlay the decision not to add them. This finding falls short of that which we are here calling for only because it does not exclude the possibility that the $20,000 price for the Lambert Corporation package was what tipped the decisional balance. As the district court determined, correctly, M–B was in any event obligated to pay that price. Whether M–B would have reached the same decision if it

had already paid the $20,000 and acquired the inventory is, to some degree, the question presented. We recognize that it calls for what may border on informed speculation. Evidence that M–B had, for whatever business reasons, become dissatisfied with the production of industrial sweepers would, of course, still support the conclusion that the decision pertinent here would have been the same. We point out that this is not apparently a case where the price for which the parties bargained became, through changed circumstances, so high that to use the bargained-for goods would itself have threatened profitability. That type of situation might lend itself to an analysis that the bargain should be honored; here, on the other hand, M–B was to pay only the cost for the inventory incurred by Lambert Corporation in the early 1960's. Self-interest informed by the inflation that characterized the balance of that decade might well have made the Lambert inventory a deal that could not be passed up, if M–B had wished to extend its position in the sweeper area. The district court, of course, will have to weigh the impact of such factors in making its

finding of good faith underlying M–B's zero requirement for the inventory parts would be appropriate, notwithstanding that both parties may have expected at the time of contracting that M–B would be able to produce the sweeper line and, in so doing, would quickly use up the inventory. If not, then it will be the district court's task to assure itself that use of all parts would have occurred if M–B had acted in good faith before entering judgment including the inventory value. We, of course, do not intend to preclude a determination that there might have been a partial use during the two-year period.

For the reasons stated, the judgment of the district court is affirmed as to the $20,000 contract price but reversed as to the inventory purchase price. The case is remanded for further proceedings not inconsistent with this opinion. The parties shall bear their own costs.

determinations. Also, the matter will presumably have to be viewed in the context of developments during the 2-year period following the agreement.