GOOD HUMOR CORPORATION, a Delaware corporation, as successor to Gold Bond Ice Cream, Inc., Plaintiff,

v.

POPSICLE JAPAN K.K., a Japanese corporation, and Occidental Foods Corporation, a British Virgin Islands corporation, Defendants.

Civ. A. No. 90–C–947.

United States District Court,
E.D. Wisconsin.

Sept. 9, 1992.

William H. Levit, Jr., Godfrey & Kahn, S.C., Milwaukee, WI, for plaintiff.

Mark Foley, Foley & Lardner, Milwaukee, WI, Richard T. Williams, Whitman & Ransom, Los Angeles, CA, for defendants.

## ORDER

TERENCE T. EVANS, Chief Judge.

As the caption suggests, this case is about flavored ice and ice cream treats—particularly Popsicles, Fudgsicles, Creamsicles, and Dreamsicles, Popsicle Big Stick and Big Bar, and the Sidewalk Sundae. The Good Humor Corporation, formerly Gold Bond Ice Cream, Inc., brought this diversity suit for declaratory relief pursuant to 28 U.S.C. § 2201 to determine the rights and legal relations of the parties under two license agreements. The two license agreements are identical for the most part, differing mainly in regard to territory covered. In one license agreement, Gold Bond grants Popsicle Japan the exclusive use of the various ice cream product trademark names in Japan. The second license agreement gives Occidental exclusive use of the trademarks in Hong Kong, as well as options for licenses in other Asian countries. Each defendant filed several counterclaims, mainly alleging breach of contract. Popsicle Japan has alleged damages of more than $1.5 million and Occidental has alleged damages in excess of $500,000.

Presently pending are motions by Gold Bond for summary judgment dismissing six counterclaims. Gold Bond challenges the third, fourth, sixth, seventh, and ninth counts of Popsicle Japan's counterclaims and the second count of Occidental's counterclaim. This decision is being mailed today but, because the trial date—September 22, 1992—is near, it will also be faxed to the attorneys so that they will have it when we discuss the case over the phone. I had planned on doing that today, but a conflict makes that impossible. Instead, I would like to call the lawyers at 2 p.m. tomorrow, September 10, 1992, for a chat.

Summary judgment is appropriate if the pleadings and submitted evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56(c). The movant has the burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). But, an adverse party may not rest upon the mere allegations or denials in its pleadings; instead, he or she "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The requirement of a genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

This is certainly not a situation where the adverse party has failed to respond: Gold Bond filed a 2-inch, bound stack of evidence and the defendants responded with 3 inches of their own. Since the facts and contractual provisions regarding each count are for the most part distinct, I will adopt Gold Bond's method of discussing the facts of each count separately. Unless specifically noted below, the facts I describe are undisputed.

### The Fujisan Visit (Popsicle's Third Count)

After the parties had signed the license agreement, Popsicle Japan attempted to at-

tract investors. Gold Bond was aware of Popsicle Japan's need for a partner or distributor. In early 1989, Popsicle Japan negotiated with a Japanese company called Fujisan Shokai K.K., which is a major wholesaler and distributor of ice cream products in Japan. In April 1989, Popsicle Japan and Fujisan entered into a memorandum documenting Fujisan's intent to invest.

In May 1989, Messrs. Ihara and Ikeda of Fujisan visited the United States to, among other things, tour a Haagen–Dazs ice cream factory. During this trip, at the request of Akira Hioki, one of Popsicle Japan's two principals, and Norio Semba, Fujisan's president, Messrs. Ihara and Ikeda met with Gold Bond's Roy Jones in Los Angeles to taste and evaluate Gold Bond products. No plant visit was requested for Ihara and Ikeda, however.

Mr. Semba himself desired to visit and inspect some of Gold Bond's factories during the course of a trip to visit a number of American ice cream manufacturers. Mr. Hioki of Popsicle Japan asked Gold Bond to allow a plant visit for Mr. Semba, but Gold Bond refused, stating that it had not received permission from its parent, Unilever.

■ In its "Third Count," Popsicle Japan claims that Gold Bond breached section 3.3(b) of the license agreement by not allowing representatives of Fujisan to make the plant visit. According to Popsicle Japan, Fujisan ultimately decided not to fund an investment based, in part, on its inability to inspect the Gold Bond facilities. In its opposition brief, Popsicle Japan adds that section 3.3(b) must be read in light of section 9.8, which requires reasonable cooperation by Gold Bond. Popsicle Japan contends that the refusal was unreasonable because 2 weeks earlier an independent consultant retained by Popsicle Japan, Dr. Jay Deb, had been given full access to Gold Bond's facilities.

Section 3.3 of the Popsicle Japan license reads in pertinent part:

3.3 *Technical Support.* ... Gold Bond shall during the Development Period provide such of the following technical assistance and support as Licensee may from time to time request:

....

(b) Upon request of Licensee and upon reasonable notice to Gold Bond, Gold Bond will permit Licensee's employees to visit Gold Bond's U.S. facilities and consult with its personnel in order to observe Gold Bond's operations and to secure information concerning the Licensed Products and the Gold Bond Production Technology and Marketing Information. All costs and expenses of Licensee's employees in connection with any such visits shall be paid by Licensee.

Section 9.8 adds the following:

9.8 *Cooperation by Gold Bond.* During the Development Period, Gold Bond shall cooperate with Licensee as reasonably requested by Licensee to enable Licensee to fully realize the commercial potential of the Trademarks in the Territory.

Summary judgment must be granted on this counterclaim; Popsicle Japan has not shown that any genuine factual dispute remains, and on these facts Gold Bond is entitled to judgment as a matter of law. In pleading its counterclaim, Popsicle Japan refers only to section 3.3(b), which clearly states that upon reasonable notice Gold Bond must "permit *Licensee's employees*" to visit Gold Bond facilities and observe operations. Mr. Semba, the president of Fujisan, was not a Popsicle Japan employee. Both Mr. Hioki and Ranjit Wakwella, the other principal of Popsicle Japan, testified on deposition that no actual employee of their company ever was denied access to any Gold Bond facility. Popsicle Japan, citing Dr. Deb's visit, argues that in practice the term "employee" was interpreted by the parties to include independent third persons. Such a construction of "employee" is well outside the normal definition and is nowhere supported by the contract itself. The present facts do not prove Popsicle Japan's construction, either. Rather than creating a greater duty for Gold Bond, Dr. Deb's visit merely shows

that Gold Bond could use its discretion to allow third parties to tour its facilities.

■ Section 9.8 adds another issue in regard to whether the request was reasonable, which could be disputed. Section 9.8, however, is not stated at all in the pleadings as a basis for this claim. It does not alter the result anyway. The broad cooperation agreement in section 9.8 must yield to the specific duties of section 3.3(b), which do not require access by non-employees of Popsicle Japan, regardless of how helpful Popsicle Japan may have deemed the visit. The same is true of Popsicle Japan's argument in its opposition brief that Gold Bond breached its duty of good faith and fair dealing; that claim is not made in the pleadings and cannot force upon Gold Bond something that is excluded by the wording of the contract itself.

### Roxyanthin Red (Fourth Count)

In April 1989, Popsicle Japan placed an order with Gold Bond for the shipment of products for test market distribution during the peak summer season. In June 1989, Popsicle Japan's first and only shipment of licensed products arrived by ship at the ports of Yokohama and Kobe in time for distribution. The Yokohama shipment was quarantined by Japanese customs officials because the pink-grapefruit-flavored Popsicles included in approximately one-third of the multipacks contained an artificial ingredient known as "roxyanthin red," the use of which is prohibited by Japanese law. After about a 6–week quarantine of the shipment, the cartons containing the pink-grapefruit flavor had to be destroyed. The Kobe shipment passed through customs due to an inspector's inadvertence, but it appears that the packages containing the pink-grapefruit flavor could not be legally sold.

The delay through customs and destruction of several thousand multipacks prevented distribution to supermarkets in June in accordance with Popsicle Japan's and

Fujisan's plans. Mr. Hioki immediately requested reimbursement from Gold Bond for direct costs incurred by Popsicle Japan regarding the destroyed Popsicles. Gold Bond was willing to pay some compensation, and on October 9 and 10, Gold Bond wire-transferred the agreed-upon amounts.

The parties do not dispute that they entered into an accord and satisfaction of costs of the botched shipment. The dispute is over how much of the damages were discharged by the accord and satisfaction. Popsicle Japan believes that the amounts paid by Gold Bond covered only direct costs such as shipping charges, import duties, and storage and disposal fees (except for carton inventory, which both parties agree was not included). The fourth counterclaim by Popsicle Japan alleges that other damages remain outstanding—for example, the lost business advantage and profits that Popsicle Japan expected by getting the product in the Japanese market during the peak summer season and lost capital due to the weakening of Fujisan's confidence in the venture, which resulted in its refusal to enter into an investment relationship.[1] Gold Bond, though, believes that the accord and satisfaction covered all claims due to the pink-grapefruit Popsicle problem and that it has been fully released from any further liability.

The accord and satisfaction was a new contract designed to resolve a dispute between the parties. It follows the normal requirements of offer, acceptance, and consideration. The present issue on this claim is simply one of determining the exact dates and scope of offer and acceptance based on the letters between the parties.

On July 13, 1989, Mr. Hioki wrote to Mr. Lutsey and first requested that Popsicle Japan be compensated in regard to the problem with the pink-grapefruit Popsicles. Mr. Hioki stated that

I need your assurance that we will be compensated for the costs involved in settling this matter. Naturally, we will

---

1. Popsicle Japan alleges that it is entitled to these other damages because Gold Bond's failure to meet Japanese requirements breached section 3.3(e) of the license agreement, in which Gold Bond promised to cooperate with Popsicle Japan in preparing products suitable for the Japanese market.

provide you with evidence of these expenditures, which will involve:

—Costs of goods and transportation from Henderson to where they are currently located (Kobe or Yokohama).

—Import duty, consumption tax, laboratory testing fees, domestic transportation, warehousing (bonded and commercial), etc.

Mr. Lutsey faxed back a July 14 response indicating his willingness to pay the above costs and the costs of destroying the pink-grapefruit-flavored bars "upon your submission of documentation." He also noted that if additional costs arose, Gold Bond would consider reimbursement.

On September 12, 1989, after bills relating to the roxyanthin red incident had arrived, Mr. Hioki again wrote to Mr. Lutsey, informing him of the precise amount of direct costs, including shipping charges, laboratory tests, import duties, storage charges and disposal fees, but leaving aside carton inventory costs until a later date. Mr. Hioki's letter concluded:

Tom, ... I have no intention of exploiting this unfortunate incident by trying to get as much compensation as possible out of it. In the same spirit, I would appreciate your recognition of the other direct costs we have incurred, such as Ranji's trip to Henderson and the consultation fees paid to Dr. Deb to help Dean Palmer complete the first shipment in time.

We are also having a difficult time moving the remaining merchandise since the goods arrived and cleared too late to place them in national supermarket chains—the only major force in Japan that can move large volumes of multipacked items.

I have given you all the facts and hope you will soon let me know what assistance you are willing to offer us. When we have agreed upon an amount, I will let you know how and where the funds should be transferred.

It is clear that at this point Popsicle Japan and Gold Bond had neither agreed on the amount of compensation nor the scope of an accord and settlement.

Mr. Lutsey responded on September 20, 1989, stating that he "accept[ed] the calculations presented as the final claim for this grapefruit package incident.... Our settlement will reimburse Popsicle Japan K.K. for the direct costs stemming from this grapefruit package incident as you presented...." Mr. Lutsey added in a figure representing carton costs but stated Gold Bond's refusal to pay for Mr. Wakwella's and Dr. Deb's expenses as well as any compensation for Popsicle Japan's difficulty in moving the remaining merchandise due to the late customs clearing date, noting that due to delays caused by Popsicle Japan the products were produced and shipped later than Gold Bond recommended. The final paragraph of Mr. Lutsey's letter is key:

Under the circumstances, we are prepared to offer Popsicle Japan K.K. a payment of US $33,965.17 ... in full payment and satisfaction of any and all claims relating to the grapefruit flavor issue. If you are willing to accept this settlement, please advise me how and where the funds should be transferred. Upon receipt of your advice, Gold Bond will make the appropriate payment and will be released from all responsibilities pertaining to this matter.

On September 25, Mr. Hioki replied, again reiterating that he had "no intention of exploiting this unfortunate incident by asking for more than the actual costs incurred. Hence, your proposal is generally acceptable to me." Mr. Hioki again set forth the amounts agreed upon, but indicated that he wanted a certain portion paid in Japanese yen rather than United States dollars. He also asked that any carton inventory payment be deferred until a later date.

In a letter of October 2, Mr. Lutsey responded, stating that it appeared that the parties were in agreement on "all matters relating to the grapefruit Popsicle incident" except for the carton inventory.

According to my understanding, we have agreed to pay, and you have agreed to accept, the following amounts in full payment and satisfaction of any and all

claims (except for carton inventory) relating to our shipment of grapefruit flavored novelties to Popsicle Japan K.K.:

1) The sum of ¥2,290,582 payable in yen, and

2) The sum of $15,644.58 payable in U.S. dollars.

Such payments will resolve and fully settle all claims you may have with respect to the grapefruit flavor issue including, without limitation, all claims and costs of the nature described in your letter of September 12, 1989 (other than claims relating to the cartons).

Before we make these payments we, of course, desire to receive your assurance that you will accept them in full payment and satisfaction of any and all claims and that you will not in the future send us additional bills or make further claims with respect to this matter.

Mr. Lutsey requested a note from Mr. Hioki setting forth the exact agreement before payment would be sent. On October 5, Mr. Hioki complied, sending Mr. Lutsey the exact wording requested:

WE HEREBY AGREE TO ACCEPT FROM GOLD BOND ICE CREAM, INC., THE AMOUNT OF JPY (YEN) 2,290,582 AND U.S. $15,644.58 AS FULL PAYMENT AND SATISFACTION OF ANY AND ALL CLAIMS WE MAY HAVE (OTHER THAN CLAIMS FOR GRAPEFRUIT CARTON INVENTORY) RELATING TO SHIPMENTS OF GRAPEFRUIT FLAVORED NOVELTIES THROUGH THE DATE HEREOF.

Gold Bond wire-transferred the amount in dollars on October 9, 1989, and the amount in yen on October 10.

Popsicle Japan believes that acceptance occurred as of Mr. Lutsey's September 20, 1989, letter and that Mr. Hioki's later waiver is invalid due to lack of consideration. Gold Bond believes that acceptance did not occur until Mr. Hioki's letter and waiver of October 5, 1989. I agree with Gold Bond.

 For a common law contract, the offer and acceptance must exactly mirror each other. That did not happen—in other words, no "meeting of the minds" occurred—until Mr. Hioki's October 5 letter.

Under Wisconsin law, acceptance upon terms varying from those of the offer, however slight, is a rejection of the offer. *Leuchtenberg v. Hoeschler*, 271 Wis. 151, 155, 72 N.W.2d 758 (1955). A counteroffer acts as both a rejection of the prior offer and as a new offer. *Todorovich v. Kinnickinnic Mutual Loan & Bldg. Ass'n*, 238 Wis. 39, 42, 298 N.W. 226 (1941). Until October 5 the parties kept making counteroffers; each letter contained new terms. Contrary to Popsicle Japan's argument, the agreement was not "completed and fully documented" on September 20. The September 20 letter changed the terms. Although Gold Bond "accept[ed] the *calculations*" of Popsicle Japan, it rejected any payments other than for direct costs and offered a certain amount to take care of any and all claims. At that time neither the total amount of payment nor the scope of the release were determined.

This is basically how the negotiating went:

Popsicle Japan (PJ): "We want to be compensated." (July 13)

Gold Bond (GB): "OK, we're willing to pay something—once we get some documentation to establish an amount. Come back to us at that time." (July 14)

PJ: "Here are our calculations based on bills for direct costs. How about reimbursement for Ranji's trip and Dr. Deb's fees, too, plus something for the fact that we missed the ideal summer test period and our customers are unhappy?" (Sept. 12)

GB: "The direct costs sound good and we'll throw in an amount for the cartons, but no go on the trip and consultation fees, nor the delay because it was Popsicle Japan's fault, too. How is this amount to take care of everything?" (Sept. 20)

PJ: "Your proposal is generally acceptable, except that we want part of it in yen and we'd prefer that the carton amount be determined later. Please wire-transfer the money." (Sept. 25)

GB: "Before we make any payments, we want to be sure that they will take

care of everything. Please send us a document affirming that this is the complete settlement you intend and showing that it is acceptable to you by using these certain words." (Oct. 2)

PJ: "We hereby agree to accept from Gold Bond...." (Oct. 5)

Even Mr. Hioki, in his letter of September 25, recognized that the September 20 letter contained merely a proposal, not an agreement to a final settlement. Not until October 5 did the parties truly agree on the terms of the settlement: approximately $30,000, part in yen and part in dollars, for any and all claims regarding the grapefruit Popsicle incident except for carton costs.

The claims in count four pertain to the pink-grapefruit Popsicle incident and are barred by the prior accord and satisfaction in which Mr. Hioki released "any and all claims [Popsicle Japan] may have (other than claims for grapefruit carton inventory) relating to shipments of grapefruit flavored novelties through the date hereof." Summary judgment is granted on this counterclaim. It is dismissed.

### The Trademark Disclaimer
### (Sixth Count)

Popsicle Japan bases this breach of contract claim on the second part of section 9.8 of the license agreement. In full, section 9.8 reads:

> 9.8. *Cooperation by Gold Bond.* During the Development Period, Gold Bond shall cooperate with Licensee as reasonably requested by Licensee to enable Licensee to fully realize the commercial potential of the Trademarks in the Territory. Such cooperation may include, but shall not be limited to, sending letters to banks, investors, distributors, retailers, wholesalers, shipping companies, government agencies, and the like verifying and confirming the existence of the license, summarizing its terms, and verifying Gold Bond's interest in acting as licensor in the Territory. Gold Bond shall cooperate with Licensee in executing such documents as may be reasonably required to register Licensee as an

authorized user and to confirm the rights of Licensee to other persons and the like.

In its pleading, Popsicle Japan alleges that it requested that Gold Bond register the assignment of rights to the trademarks from Consolidated Foods Corporation (the predecessor in interest of Gold Bond) to Gold Bond so as to enable Popsicle Japan to register its exclusive license to use the trademarks. As a result of Gold Bond's failure to register the assignment of rights to the trademarks from Consolidated Foods to Gold Bond, Popsicle Japan says that potential investors and customers who conducted inquiries into ownership of the trademarks found that Popsicle Japan was not officially registered to use them. Popsicle Japan therefore lost credibility, it says, and was prevented from realizing the commercial potential of the trademarks. It also says it has suffered damages like lost capital investment, lost royalty payments and profits.

Gold Bond has moved for summary judgment on this claim because in response to interrogatories, Popsicle Japan also claimed that section 8.1 of the license, which disclaims any warranty on trademark ownership, was also breached. Even Gold Bond admits that its motion would not dispose of the entire claim, as it "addresses the Section 8.1 claim but not the Section 9.8 claim because the latter arguably may raise fact issues not appropriate for resolution prior to trial." (Brief in support at 14 n. 5.) The section 9.8 claim alleging a failure to register the assignment of rights will therefore continue to trial. Only section 8.1 is presently in contention, and Popsicle Japan disputes whether summary judgment can be entered on that claim.

■ But a step has been missed here as the status of any section 8.1 claim is questionable. No section 8.1 claim is contained in the pleading of this count, and Popsicle Japan states that it alleged a violation of section 8.1 "only at Gold Bond's invitation, in response to Gold Bond's Second Set of Interrogatories," which does not bring the claim officially into the case. The counterclaims have never been amended. Nevertheless, both parties have acted as if the

claim is part of the case. The summary judgment briefs and exhibits indicate that discovery has included this claim. This is an instance, then, where the pleadings should be amended to conform to the evidence. Fed.R.Civ.P. 15(b).

Section 8.1 disclaims all warranties by Gold Bond with respect to its ownership or other rights in, or the validity of, the trademarks in Japan. Popsicle Japan took on all risk that the trademarks were not validly owned by Gold Bond, representing that it had made such investigation of the use and status of the trademarks as it considered appropriate, and waived any claims against Gold Bond in the event that any specified trademark or trade dress was owned by others. Gold Bond made only one warranty in section 8.1 with regard to the trademarks:

> Notwithstanding the foregoing, Gold Bond warrants that, as of the date of this Agreement, it has no knowledge that any Trademark is invalid in the Territory or that any person is claiming rights which would interfere with Licensee's exclusive use thereof (to the extent Licensee is entitled to such an exclusive use hereunder) or that any person disputes the validity in degree of any Trademarks in the Territory or in any Option Country. Licensee acknowledges that all Trademarks are not registered in the Territory and such warranty by Gold Bond does not extend to any defects in any Trademark arising from lack of registration.

■ On summary judgment, Gold Bond argues that Popsicle Japan's claims are based on registration defects, which are not warranted under the "no knowledge" clause. Popsicle Japan's claim, as proffered in its interrogatory answers, does include statements that the "Popsicle," "Dreamsicle," and "Fudgsicle" marks were not registered in Gold Bond's name and that Gold Bond had never attempted to register either the "Sicle" or "Sidewalk

Sundae" marks in Japan. I agree with Gold Bond that any claim for damages based on the nonexistent or defective registration of these trademarks has been waived by section 8.1.[2]

■ The rest of the claim, however, focuses on Gold Bond's *knowledge* prior to December 22, 1988, which Gold Bond did indeed warrant. Popsicle Japan contends that Gold Bond's statement about having "no knowledge" was untrue because it knew in 1984 that the Japanese trademark examiner had rejected an application for registration of the "Creamsicle" mark, that Gold Bond knew in 1988 that the examiner had rejected applications for registration of the "Big Stick" and "Big Bar" marks, and that it knew by 1988 that the trademark for "Sicle" was registered to a third party. These allegations, supported by sufficient facts at this time, show that genuine issues remain for trial: whether Gold Bond knew that any trademark was invalid or that a third party—the "Sicle" mark owner—was interfering with Popsicle Japan's exclusive rights under the contract. In regard to the accusations about prior knowledge, the summary judgment motion must be denied.

Within 14 days of the date of this order, Popsicle Japan must file an amendment to its counterclaims, setting forth this claim based the prior knowledge warranty. Because this claim is really distinct from count six, it should be deemed the "Tenth Count." If no amendment is filed, I will assume that Popsicle Japan does not wish to pursue this claim separately and the claim will be lost.

### The Manufacturing Agreement (Seventh Count)

■ Section 9.3 of the Popsicle Japan license provides that "[t]his agreement and the Manufacturing Agreement constitute the entire agreements between the parties...." No manufacturing agreement between the parties has ever been signed,

---

**2.** I note that the waiver of responsibility for lack of registration prior to December 1988 does not conflict with the claim under section 9.8, which alleges that Gold Bond failed to meet its obligations regarding registration documentation following a reasonable request by Popsicle Japan after the license agreement was in place. Popsicle Japan's claims in count six are based on Gold Bond's failures subsequent to December 1988, in alleged contravention of section 9.8.

though. No provision in the license agreement literally obligates Gold Bond to sign a manufacturing agreement. But, in the seventh counterclaim, Popsicle Japan contends that under section 9.8's cooperation clause, Gold Bond was required to sign one. To Popsicle Japan, the manufacturing agreement was essential.

Again, the facts are undisputed. Before December 22, 1988, the parties contemplated that a manufacturing agreement would be executed to supply Popsicle Japan with products during the development period until Popsicle Japan could find a manufacturer of its own. But, at the December 22, 1988, Tokyo signing ceremony, Mr. Hioki of Popsicle Japan refused to sign the manufacturing agreement because—even though approved by counsel—Mr. Hioki thought it unworkable in an international context. During early 1989, the parties negotiated revisions to the manufacturing agreement. Although Popsicle Japan signed the revised agreement in May 1989, Gold Bond then refused because it did not receive approval from Unilever N.V., which owns Gold Bond's parent company, Thomas J. Lipton, Inc.

In the motion for summary judgment, Gold Bond argues that section 9.8 does not require execution of a manufacturing contract because its language does not specify one at all, and, even if section 9.8 creates an obligation to sign, it is unenforceable as a matter of law because it is a vague "agreement to agree." In addition, Gold Bond argues that Popsicle Japan waived any right to complain because it was the first party that refused to sign.

Popsicle Japan, however, contends that the parties had agreed to execute a manufacturing agreement "as an integral part of their existing contractual relationship." Popsicle Japan adds that the parties had orally agreed to the bargain itself and merely planned to execute the document to memorialize it. *See Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir.1978) ("If it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has

not been executed."). In explaining rejection of the contract on December 22, Popsicle Japan claims that Mr. Hioki did not reject the deal itself, but rather a contract that just was not suited to international use. Popsicle Japan adds that Gold Bond not only failed to cooperate, but also breached its duty to deal in good faith.

Popsicle Japan's arguments in opposition to summary judgment are confused and again raise issues outside the scope of its pleadings. This seventh counterclaim alleges that the license agreement required Gold Bond to sign another contract. *Lambert* is inapposite since Popsicle Japan has not alleged a breach of the unexecuted manufacturing agreement itself. Moreover, as the *Lambert* court observed, "[e]ven if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed." *Id.* at 135.

Popsicle Japan does not explain how the license agreement, which expressly contemplates that the manufacturing contract would be executed prior to or simultaneously with the license itself, could require Gold Bond to execute a revised manufacturing agreement at some unspecified time in the future. Section 9.3 indicates that at the time the license was signed, the parties intended that the manufacturing agreement be an entirely separate but contemporaneous contract. Modification of this license is not valid unless it is in writing, signed by the party against whom it is used. License agreement § 9.3. Reading the word "cooperation" in section 9.8 so broadly as to require Gold Bond to sign a manufacturing contract at a later date would impermissibly modify the license agreement.

Furthermore, if section 9.8 required Gold Bond to execute a manufacturing agreement, that requirement would be unenforceable because it fails to "spell out the essential commitments and the obligations of each party with reasonable certainty." *Witt v. Realist, Inc.*, 18 Wis.2d 282, 297, 118 N.W.2d 85 (1962). To be enforceable,

the contract must be definite and certain as to its basic terms and requirements. *Id.* Generally, a party has a right not to enter into a contractual relationship. To compel a party to execute a contract requires more than the words "shall cooperate ... as reasonably requested ... to enable Licensee to fully realize the commercial potential of the Trademarks...."

I also note that even if section 9.8 were read to contain such a requirement, it would only require execution of the manufacturing agreement version in existence at that time, not whatever revisions Popsicle Japan decided to make in the future. Mr. Hioki's rejection of the December 22 version of the manufacturing contract—no matter the reason—thus terminated any responsibility Gold Bond could have had.

Summary judgment is granted and claim seven is dismissed.

### The Lipton Purchase (Ninth Count)

According to Gold Bond, approximately one week prior to the December 22, 1988, execution of the Popsicle Japan license, Thomas J. Lutsey, president of Gold Bond, met with Blaine R. Hess, president of Thomas J. Lipton, Inc. At this meeting they renewed their business acquaintance and agreed to meet again in 1989 to discuss a possible business transaction between their companies. According to Popsicle Japan, Mr. Lutsey and Mr. Hess had spoken on other occasions prior to the December 1988 meeting and had discussed the possible acquisition of Gold Bond by Lipton.

The parties do not dispute that on January 13, 1989, about three weeks after the Popsicle Japan license had been signed, Lipton signed a confidentiality agreement and began receiving information to explore a possible acquisition of Gold Bond. Then, on May 31, 1989, Lipton entered into a share purchase agreement with the shareholders of Gold Bond and thereafter acquired all of Gold Bond's outstanding shares. Lipton's parent company, Unilever N.V., also wholly owns a company called Nippon Lever B.V., which markets and distributes in Japan a frozen ice cream cake roll known as the "Viennetta."

In the ninth count of Popsicle Japan's counterclaims, Popsicle Japan alleges that during negotiations for the license agreement, Gold Bond failed to disclose that it was contemplating a sale to Lipton and that Unilever would be competing with Popsicle Japan through Nippon Lever's sale of frozen ice cream products. Popsicle Japan claims that Gold Bond's failure to disclose these facts constituted a material breach of its cooperation obligation under section 9.8 and that Popsicle Japan would not have entered into the license agreement had it known of the negotiations between Gold Bond and Lipton.

Gold Bond has moved for summary judgment on this claim because it believes that Popsicle Japan has shown no proof that Messrs. Hess and Lutsey discussed the sale of Gold Bond; therefore, there was nothing for Gold Bond to disclose. Furthermore, Gold Bond indicates that although Nippon Lever has tested novelty frozen dessert products, it has not regularly marketed any products that competed with Popsicle Japan's products. Its only ice cream product marketed in Japan has been the Viennetta, the marketing of which antedates the Popsicle Japan license, and which does not compete with the products licensed to Popsicle Japan. Finally, Gold Bond argues that section 9.8 is inapplicable to nondisclosure anyway; nondisclosure has nothing to do with cooperation "as reasonably requested" by Popsicle Japan.

Popsicle Japan has sufficiently disputed the facts that Gold Bond has presented. In regard to negotiations, although Gold Bond contends that Popsicle Japan has no hard evidence that Messrs. Hess and Lutsey discussed the sale of Gold Bond at their December 14 meeting, evidence does exist. Although the specifics of a merger or buyout were not discussed according to Mr. Hess and Mr. Lutsey, some evidence does indeed suggest that a general discussion of sale occurred. In his deposition testimony, Mr. Hess stated that "the discussion was really about should we get together next year, and hopefully as soon as practical, and see if there was some way we could strengthen our businesses by bringing

them together some way. What we agreed on, as I recall, was that we would, you know, we would really sit down and talk seriously in the new year...." In addition, throughout the past Mr. Lutsey had indicated a desire to purchase Good Humor and Mr. Hess had mentioned a desire to purchase Gold Bond. The fact that Lipton and Gold Bond signed a confidentiality agreement only 3 weeks after execution of the license agreement supports an inference that Lipton and Gold Bond moved too fast to not have been discussing the issue prior to December 22, 1988.

In regard to competition, Gold Bond's interpretation of the facts is just too narrow to justify summary judgment. Popsicle Japan has shown that Unilever operates a number of ice cream businesses throughout the world. Lipton owns Good Humor, into which Gold Bond has now been merged. In 1989, Nippon Lever was looking to expand its frozen food business and, in particular, was considering expanding its ice cream business in light of the liberalization of the Japanese ice cream market. Nippon Lever even tested some ice cream novelties in Japan. *See* defendants' exhibit U. I do not give Gold Bond's distinction between "testing" and full "marketing" of frozen dessert products in Japan much weight in regard to this motion for summary judgment. What was discussed by Messrs. Hess and Lutsey and what type of competition Gold Bond, through Unilever, now presents are genuine factual disputes.

A question remains, however: do these disputes fall under the cooperation clause of section 9.8? Again, section 9.8 requires Gold Bond to "cooperate with Licensee as reasonably requested by Licensee to enable Licensee to fully realize the commercial potential of the Trademarks in the Territory." The language of this provision does not warrant the corporate status of Gold Bond, and there is no evidence that Popsicle Japan requested information on whether Gold Bond contemplated any sale or merger. Popsicle Japan neglects to adequately argue about section 9.8 in its summary judgment brief. The argument appears to be that Gold Bond knew that it would be acquired by Unilever and that a Unilever subsidiary would be competing with Popsicle Japan, thus encouraging Gold Bond to hinder Popsicle Japan's efforts to commercially exploit the trademarks. Popsicle Japan believes that the sale of Gold Bond to an alleged competitor contradicts with and thwarts the thrust and purpose of section 9.8, which is to help expand the commercial potential of the trademarks in Japan for Popsicle Japan's and Gold Bond's mutual benefit.

In regard to any nondisclosure prior to execution of the contract, Popsicle Japan has no claim under section 9.8. The provision is not a warranty. Prior to that time the contract could not have imposed any other obligations; it did not exist. For nondisclosure and secrecy after execution of the license agreement, Popsicle Japan's claim under section 9.8 is a stretch; however, it can be made. Gold Bond's argument that Popsicle Japan never asked for disclosure of corporate buyout or restructuring possibilities uses too narrow a reading of section 9.8. The cooperation sentence obligates Gold Bond to work with Popsicle Japan to make the results of the license agreement successful. Gold Bond's secrecy about joining with a competitor of Popsicle Japan—if those allegations are true—could frustrate the purpose of such a cooperation clause. This claim may proceed to trial, as limited by this order.

■■■■ In its opposition brief, Popsicle Japan argues that Gold Bond's failure to inform Popsicle Japan of the ongoing negotiations constitutes a breach of the covenant of good faith and fair dealing, which requires a party to disclose facts exclusively within its knowledge that import on the transaction. Even though section 5.12 of the license agreement bars Gold Bond from giving any other entities license to manufacture or sell the trademarked products in Japan, Popsicle Japan argues that the Unilever acquisition nevertheless negatively affected the license agreement because after the acquisition Gold Bond deferred to Unilever in its dealings with Popsicle Japan. For example, Gold Bond refused to allow Mr. Semba of Fujisan to visit the facilities without approval from Unilever.

Then, Gold Bond refused to execute the manufacturing agreement because Unilever had not given authorization. Again, that claim is not stated in the pleadings, but because it is so related to the rest of claim nine, I will deem the claim amended under rule 15(b) to include breach of the covenant of good faith and fair dealing.

### Hong Kong Cancellation Proceedings (Occidental's Amended Second Count)

▮ In July 1989, Popsicle Industries, Ltd. of Canada instituted three separate proceedings to cancel the Hong Kong registrations for "Popsicle," "Fudgsicle," and "Creamsicle." Popsicle Industries' ground for seeking cancellation is that the registrant did not make use of the trademarks or the registration for the preceding period of 5 years.

At the time that the proceedings commenced, these three trademarks were still registered in the name of Consolidated Foods (now the Sara Lee Corporation), which formerly owned Gold Bond. Due to the failure to update the registration to name Gold Bond as owner of the trademarks, Gold Bond's trademark counsel first learned of the Hong Kong proceedings in late August 1990 when Sara Lee forwarded related documents. Through Hong Kong counsel, Gold Bond applied to obtain leave for Gold Bond to intervene, and, after a hearing in early 1991, the Hong Kong trademark office examiner did grant Gold Bond the right to intervene in the cancellation proceedings. Popsicle Industries was required to file evidence in support of its case by February 29, 1992. Although immaterial to this claim, the parties have not indicated whether any decision has been reached in those proceedings. As of March 1992, however, Gold Bond had spent more than $40,000 defending the Hong Kong proceedings.

In its second counterclaim, Occidental alleges that Gold Bond breached the Occidental license agreement by "failing adequately to defend against a petition filed by Popsicle Industries, Ltd. to cancel the registration of the Sicle Trademarks in Hong Kong." Gold Bond's behavior allegedly breaches section 10.8 of the Occidental license, which is virtually identical to Popsicle Japan's section 9.8. Specifically, Occidental claims that through, among other things, inadequate defense of the Hong Kong petition, Gold Bond failed to cooperate with Occidental to register Occidental as an authorized user of the trademarks and failed to cooperate to enable Occidental to realize the trademarks' full commercial potential. In addition, Occidental alleges that Gold Bond has breached the obligations of good faith and fair dealing implied in its contractual relationship with Occidental.

On the summary judgment motion, Gold Bond argues first that it has vigorously defended the Hong Kong proceedings and that Occidental has not shown any factual support for its claim to the contrary. Second, Gold Bond asserts that through section 8.1 of the Occidental license—virtually identical to section 8.1 of the Popsicle Japan license—Occidental has waived any claim relating to trademark ownership or registration.

I agree with Gold Bond on the first point. In response to an interrogatory requesting Occidental to set forth the factual and legal basis for its contentions, Occidental answered that it

> currently is analyzing Gold Bond's defense of the petition brought by Popsicle Industries, Ltd. and will supplement its response to this interrogatory when it completes its analysis.

At the time of the summary judgment briefing, the response had not been supplemented. Nowhere in its opposition brief does Occidental argue with the facts as I have stated them. Gold Bond has both American and Hong Kong counsel working on the case, the application to intervene in the proceedings was successful, Gold Bond has filed counterstatements to defend all three trademarks, Gold Bond has told its American counsel to vigorously defend the cases, and as of March 1992, it spent more than $40,000 in the proceedings. Nowhere in its opposition brief does Occidental ex-

plain or argue how this effort is inadequate.

With no argument by Occidental to the contrary, I find that the defense has indeed been reasonable and adequate. Gold Bond, therefore, cannot, due to its actions defending the Hong Kong proceedings, be accused of failing to "cooperate with Licensee as reasonably requested by Licensee to enable Licensee to fully realize the commercial potential of the Trademarks" nor of failing to execute such documents as may be reasonably required to register Occidental as an authorized user. Gold Bond's defense of the Hong Kong action is itself adequate cooperation and adequate execution of documents to satisfy section 10.8.

■■■ Once again, a defendant in this case argues in its opposition brief a claim not included in the counterclaim pleadings. In effect abandoning its "failure to defend" claim, Occidental argues that Gold Bond breached section 10.8 and its duty of good faith by not registering Occidental as an authorized user of the trademarks during the months between execution of the license agreement and when the Hong Kong proceedings arose.[3] Says Occidental:

> Gold Bond did nothing at all to ensure that Occidental would become registered as an authorized user. By August 1990, when Gold Bond first became aware of the Hong Kong suit, Sara Lee Corporation was still the record owner of the Hong Kong Registrations. ... In fact, it was necessary for Gold Bond to first file an application to intervene in the Hong Kong proceedings....
>
> ... In its application, Gold Bond admits that, when it acquired the assets of Popsicle Industries, Inc. in 1986, the "Popsicle," "Creamsicle" and "Fudgesicle" trademarks were not included in the schedule of trademarks supposedly acquired by Gold Bond.... As of January 28, 1991, Gold Bond still had not recorded assignments of the registrations at

issue in Hong Kong.... Consequently, Gold Bond was not able to assign the trademarks to Occidental.

This new twist on the claim has not been presented or even mentioned prior to the brief in opposition. The only way it could be considered included in the counterclaim pleading is in paragraph 14 where Occidental alleges that Gold Bond breached section 10.8 "including, *without limitation*, by failing adequately to defend against a petition filed by Popsicle Industries, Ltd. to cancel the registration...." That is not enough to put Gold Bond on notice that this new claim might be raised. And, it is too late at this time to allow amendment of this claim to include the allegations about Gold Bond's failure to ever complete registration documents after execution of the license. Summary judgment is granted on this count and the count cannot be amended.

### Summary

IT IS THEREFORE ORDERED that summary judgment is GRANTED on counts 3, 4, and 7 of the Popsicle Japan counterclaims and count 2 of the Occidental counterclaims. Summary judgment is DENIED on count 6 as discussed above, and Popsicle Japan, within 14 days, must file an amendment to its counterclaims if it wishes to retain a claim based on the "no knowledge" warranty in section 8.1. Summary judgment is also DENIED on count 9.

---

**3.** Occidental waived any and all claims due to actual defects in ownership or registration, representing that it had made such investigation as it deemed necessary. Occidental license § 8.1.

Occidental can only argue about a section 10.8 duty to cooperate to complete registration documents after execution of the license.